724 F.2d 1230
 14 Fed. R. Evid. Serv. 737
 QUAD/GRAPHICS, INC., a Wisconsin corporation, Plaintiff-Appellee,
v.
Myron FASS; Readington Farms, Inc.; Countrywide
Publications, Inc.; Stories, Layouts and Press, Inc.;
Equine Enterprises, Inc.; Fass Publications, Inc.; General
Newstand Publishing Corp.; Great American Magazines, Inc.;
Jock, Inc.; M.F. Enterprises, Inc.; Modern Sports, Inc.;
National Newstand Publishing Corp.; Newstand Media
Publishing Corp.; and U.S. Publishing, Inc., Defendants-Appellants.
 No. 82-2976.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 13, 1983.
Decided Nov. 3, 1983.*
 
 1
 Bruce C. O'Neill, Fox, Carpenter, O'Neill & Shannon, Milwaukee, Wis., for defendants-appellants.
 
 
 2
 Robert K. Steuer, Weiss, Steuer, Berzowski, Brady & Donahue, Milwaukee, Wis., for plaintiff-appellee.
 
 
 3
 Before WOOD and ESCHBACH, Circuit Judges, and CAMPBELL, Senior District Judge.**
 
 
 4
 WILLIAM J. CAMPBELL, Senior District Judge.
 
 
 5
 Quad/Graphics, Inc. filed the complaint in this cause on February 11, 1980 seeking $1,500,000 due on contracts with numerous corporate defendants. Irving Fass and Myron Fass, the principals of those corporations, were also named as defendants because the plaintiff sought to pierce the corporate veil and impose personal liability on them. After the defendants filed answers and counterclaims and substantial discovery was completed, Irving Fass reached a settlement with Quad/Graphics and, over the objections of the other defendants, was dismissed from the lawsuit. The case proceeded to a non-jury trial and the district court, 548 F.Supp. 966, found for the plaintiff and entered a judgment against the corporations for $1,500,000 and against Myron Fass for $750,000. The defendants' counter-claims were dismissed. The defendants bring this appeal contesting the court's findings and conclusions regarding liability as well as various pre-trial decisions. For the reasons stated below, we affirm.
 
 
 6
 Appellants raise numerous issues which can be grouped into three categories. First, they argue that the settlement between Quad/Graphics and Irving Fass was improper and should have been set aside or, alternatively, that it should have been admitted into evidence at trial. These contentions will be addressed below. The appellants also argue that the district court's findings of fact and conclusions of law were erroneous. However, upon review of the trial court's Decision and Order dated September 9, 1982, we find no error therein and hereby adopt it as dispositive of those issues. Lastly, appellants claim error in the district court's issuance of a protective order preventing the deposition of Quad/Graphics' attorney, Robert Steuer. Upon review of Judge Gordon's order of September 25, 1980 on that matter, we find no fault with his ruling and hereby adopt that order as dispositive of that contention.
 
 
 7
 The settlement agreement between Quad/Graphics and Irving Fass is reproduced in the Appendix hereto. Generally, it provided that Quad/Graphics would dismiss its claims against him and satisfy the judgment to the extent it would create a right of contribution against him in return for Irving's payment of $25,000 and his withdrawal from the lawsuit. The terms of Irving's withdrawal included an agreement not to financially support the defense or to voluntarily testify, as well as an assignment to Quad/Graphics of any benefits he might receive through the corporations as a result of the counter-claims.
 
 
 8
 When Quad/Graphics moved to dismiss Irving pursuant to Rule 41(a)(2) the other defendants objected. Their major argument was that Irving's withdrawal from the lawsuit violated his duty to the corporations to support their defense. They noted that because Irving was the corporate officer involved in the production aspect of the business, he was the person most knowledgeable as to the negotiations and transactions in issue. His loss, they claimed, crippled their defenses and violated his fiduciary duty to honestly and unselfishly further the best interests of the corporations. After receiving briefs on the issues, the district court granted the motion to dismiss without requiring disclosure of the settlement agreement.[1]
 
 
 9
 The court based its decision on numerous grounds, including inter alia, that the non-settling defendants did not have standing to challenge the settlement, citing In Re Beef Industry Antitrust Litigation, 607 F.2d 167 (5th Cir.1979). Since standing is a threshold issue, we must address it first.
 
 
 10
 We note initially that the nature of this lawsuit does not require the court to independently evaluate the fairness or reasonableness of the settlement as it might in other situations, see McDonald v. Chicago Milwaukee Corp., 565 F.2d 416 (7th Cir.1977) (class action); Metropolitan Housing Development Corp. v. Village of Arlington Heights, 616 F.2d 1006 (7th Cir.1980) (Fair Housing Act suit alleging racial discrimination); Protective Committee v. Anderson, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) (bankruptcy compromise of claims); Norman v. McKee, 431 F.2d 769 (9th Cir.1970) (stockholder derivative suit); Gueho v. Diamond M. Drilling Company, 524 F.2d 986 (5th Cir.1976) (seaman's rights); Gaxiola v. Schmidt, 508 F.Supp. 401 (E.D.Tenn.1980) (plaintiffs under disability of minority); New Mexico Veteran's Service Commission v. United Van Lines, Inc., 325 F.2d 548 (10th Cir.1963) (incompetent party); United States v. Bechtel Corp., 648 F.2d 660 (9th Cir.1981), cert. den. 454 U.S. 1083, 102 S.Ct. 638, 70 L.Ed.2d 617 (1981) (antitrust action brought by United States, see 15 U.S.C. Sec. 16(e)). This is strictly "ordinary litigation" between private parties and therefore "settlement of the dispute is solely in the hands of the parties," United States v. Miami, 614 F.2d 1322, 1330 (5th Cir.1980). However, in multi-party lawsuits, non-settling defendants often seek the court's intervention to invalidate or alter partial settlements. The Beef Industry case cited by the district court states the general proposition that non-settling defendants who are not prejudiced by a partial settlement have no standing to challenge it, see Beef Industry, 607 F.2d at 172 citing, In re Nissan Motor Corp. Antitrust Litigation, 552 F.2d 1088 (5th Cir.1977); see also In re Viatron Computer Systems Corporation Litigation, 614 F.2d 11 (1st Cir.1980). However, the court in Beef Industry did quote with approval from Newberg on Class Actions:
 
 
 11
 [N]onsettling defendants in a partial settlement have no standing to object to the fairness or adequacy of the settlement, but they may object to any terms that preclude them from seeking indemnification from the settling defendants. 3 Newberg on Class Actions (1977) Sec. 5660b at 564-565.
 
 
 12
 For example, in Altman v. Liberty Equities Corp., 54 F.R.D. 620 (S.D.N.Y.1972) a non-settling defendant objected to a partial settlement in a class action securities case. The proposed settlement included a provision barring the non-settling defendants from pursuing any claim for indemnification or contribution against the settling defendants. The court concluded that it could not approve the settlement:
 
 
 13
 There can be no doubt that this result may be read to cut athwart the policy consideration in favor of settlements of litigations, including class actions. Indeed, from the point of view of the plaintiff and the class which he represents in this case, it is at least theoretically possible that this ruling may work a deprivation of their contemplated partial recovery now of a substantial amount of money. These cogent considerations notwithstanding, I cannot approve of the proposed settlement so long as it contains the bar order. While there may be circumstances in which a court in its discretion should enforce such a bar provision, here I conclude that to cut off the remaining nine defendants at this early stage of the litigation from their rights of contribution or indemnification would be unjust. 54 F.R.D. at 625.
 
 
 14
 In Altman, enforcement of the proposed settlement would have prejudiced the non-settling defendants rights to indemnification and contribution, and no collateral means existed to protect those rights. Therefore, based on the objections, the court refused to accept the settlement, implicitly finding that the non-settling defendants had standing to be heard on the issue.
 
 
 15
 In Krause v. Rhodes, 640 F.2d 214 (6th Cir.1981), a settlement was challenged by prior counsel for the plaintiffs on the grounds that it violated his contingency fee contract. The underlying case arose out of the tragic incident at Kent State University in 1970. The plaintiffs were persons who had been injured or killed in the shooting and they had sued various state and federal officials for damages under 42 U.S.C. Sec. 1983. Steven Sindell originally represented twelve of the plaintiffs under contracts providing for a 33 1/3% contingency fee. After lengthy legal proceedings, including two sets of appeals, the American Civil Liberties Union became lead counsel for the plaintiffs. Thereafter, a settlement fund of $675,000 was offered by the State of Ohio with the condition that $600,000 would be paid directly to the plaintiffs and the balance would be available for attorneys' fees and expenses. The settlement was accepted by the parties and approved by the presiding judge, who also determined the allocation of the $75,000. Sindell received a significant portion of that fund but objected and appealed on the ground that the settlement operated to invalidate his contingency fee contract with the plaintiffs. However, the appellate court upheld the settlement, concluding that a federal judge had the authority to contravene a contingency fee contract and that the trial court had not abused its discretion in doing so under the facts of the case. While the subject of standing was not specifically addressed by the court, it is implicit in the discussion of the merits that Sindell had standing to challenge the settlement. As in Altman, the objector demonstrated that he would necessarily suffer legal prejudice, i.e. invalidation of his contract rights, as a result of the settlement.
 
 
 16
 This analysis leads us to conclude that a non-settling party must demonstrate plain legal prejudice in order to have standing to challenge a partial settlement. This standard implements the policy consideration of encouraging the voluntary resolution of lawsuits and maintains consistency in the application of Federal Rule of Civil Procedure 41(a)(2) regarding voluntary dismissals. Under that rule a defendant must demonstrate plain legal prejudice in order to prevent a voluntary dismissal of the claim against him by a plaintiff, Stern v. Barnett, 452 F.2d 211, 213 (7th Cir.1971); Hamilton v. Firestone Tire & Rubber Co. Inc., 679 F.2d 143 (9th Cir.1982); Hoffmann v. Alside, Inc., 596 F.2d 822 (8th Cir.1979); Holiday Queen Land Corp. v. Baker, 489 F.2d 1031 (5th Cir.1974); but see, Ferguson v. Eakle, 492 F.2d 26 (3rd Cir.1974). In applying this standard the courts cited above have determined that a showing of injury in fact, such as the prospect of a second lawsuit or the creation of a tactical advantage, is insufficient to justify denying the plaintiff's motion to dismiss.[2] In the context of a partial settlement, Rule 41(a)(2) is usually the mechanism by which the settling defendants are eliminated from the case. It would indeed be incongruous for a non-settling defendant to have any less of a burden in attempting to prevent such a voluntary dismissal than he would if he were the party being dismissed. Therefore, we do not believe that a court should inquire into the propriety of a partial settlement merely upon a showing of factual injury to a non-settling party. Some disadvantage to the remaining defendants is bound to occur and may, in fact, be the motivation behind the settlement. But just as a court has no justification for interfering in the plaintiff's initial choice of the parties it will sue (absent considerations of necessary parties), the court should not intercede in the plaintiff's decision to settle with certain parties, unless a remaining party can demonstrate plain legal prejudice. This standard should strike the proper balance between the policy consideration of encouraging voluntary resolutions of litigation and the court's duty to protect the rights of the parties before it.
 
 
 17
 Applying the standard discussed above we conclude that the appellants have not demonstrated plain legal prejudice. They claim that the corporation's right to the assistance and cooperation of its officer was violated by the settlement agreement. However, even assuming the applicability of such a duty to Irving, the settlement agreement does not require him to violate it. The agreement does not prohibit Irving from testifying or assisting the corporation, it only provides that he shall not voluntarily participate in the litigation. Thus, to the extent Irving had a legal duty to the corporations, they could obtain their rights by bringing an appropriate legal action against him to determine the nature of his duty and to compel him to perform it. Admittedly, the preservation of the corporations' rights would require additional expense and effort, but that consideration by itself is insufficient to demonstrate plain legal prejudice.
 
 
 18
 While it may appear that we are drawing a fine line and encouraging additional litigation, an analysis of the situation reveals the prudence of our decision. The record demonstrates unequivocally that Irving, not Quad/Graphics, initiated the settlement negotiations. At his deposition he explained his motivation for doing so.
 
 
 19
 "I think emotionally I have had enough of this case. One of the reasons of the settlement is I don't want to go into it any further." (p. 52, li. 20-22).
 
 
 20
 Thus, it appears that Irving's disinclination to participate in the lawsuit predated the settlement agreement and existed independently of it. Therefore, even if the court had interfered in the settlement, the corporations would not have been assured of Irving's cooperation. The problem was solely a matter between the corporations and Irving, and a second lawsuit would be inevitable if the corporation deemed Irving's assistance to be crucial. The only procedural means by which it could have been raised in this cause would have been by the filing of a cross-claim. However, that action would have been inappropriate because the claim was not one "arising out of the subject matter ... of the original action," see Federal Rule of Civil Procedure 13(g).
 
 
 21
 Appellants also contend that they were prejudiced because the settlement agreement made Quad/Graphics a shareholder in the corporations. This argument is based on appellants' mischaracterization of Paragraph 2 of the agreement as an assignment of Irving's shares in the corporations to Quad/Graphics. However, that provision only assigned to Quad/Graphics any benefits Irving might receive as a result of the corporations' counterclaims. It is obvious that no shares were transferred or that any control over the corporations was assumed by Quad/Graphics.
 
 
 22
 The remaining allegations of harm by the appellants do not rise to the level of plain legal prejudice. They claim that the preparation of their case was made more difficult and that they suffered the disadvantage of not having Irving's live testimony at trial.[3] These are simply allegations of injury in fact. Additionally, as discussed above, there is some doubt that the settlement agreement was the cause of this alleged harm. Therefore, for the reasons stated above, the trial court did not err in refusing to set aside the settlement agreement.
 
 
 23
 Alternatively, appellants contend that the settlement agreement should have been admitted into evidence at trial. Federal Rule of Evidence 408[4] prohibits the admissibility of such evidence "to prove liability for or invalidity of the claim or its amount." However, the rule does not prohibit the admission of such evidence for other purposes, see In Re General Motors Corp. Engine Interchange Litigation, 594 F.2d 1106, 1124 (7th Cir.1979) (evidence of negotiations admissible on issue of fairness of partial settlement in class action); Central Soya Co. Inc. v. Epstein Fisheries, Inc., 676 F.2d 939 (7th Cir.1982) (evidence of settlement admissible to show partial forgiveness of primary debt in guaranty case); Breuer Electric Manufacturing Co. v. Toronado Systems of America, Inc., 687 F.2d 182 (7th Cir.1982) (evidence of settlement negotiations admissible in hearing to set aside default to show defendants' awareness of claim); see also, Reichenbach v. Smith, 528 F.2d 1072, 1074-1075 (5th Cir.1976) (discussion regarding use of settlement evidence for impeachment).
 
 
 24
 Undaunted by the clear language of the rule, the appellants contend that evidence of the settlement was admissible in this case to show the invalidity of Quad/Graphics' claims. No cases are cited for this contention, the only support being one sentence in the Advisory Committee's Notes which, not surprisingly, is taken out of context. The relevant portion of the Notes is quoted below, with the sentence relied upon by the appellants italicized.
 
 
 25
 As with evidence of subsequent remedial measures, dealt with in Rule 407, exclusion may be based on two grounds. (1) The evidence is irrelevant, since the offer may be motivated by a desire for peace rather than from any concession of weakness of position. The validity of this position will vary as the amount of the offer varies in relation to the size of the claim and may also be influenced by other circumstances. (2) A more consistently impressive ground is promotion of the public policy favoring the compromise and settlement of disputes.
 
 
 26
 Based on accepted canons of statutory construction as well as a reading of the Notes as a whole, it is clear that that one sentence was not intended to create an exception to the rule. No such exception is stated in the rule and this case demonstrates the wisdom of that omission. At his deposition, Irving testified that the monetary aspect of the settlement was based on the amount he was financially able to pay. The appellants have offered no challenge to that evidence. That consideration is obviously a reasonable one and demonstrates that the amount of the settlement payment bore no relationship to the validity or value of Quad/Graphics' claim.
 
 
 27
 Appellants also rely on the section of the Advisory Notes which suggests that evidence of the "buying off" of a witness might be admissible:
 
 
 28
 An effort to "buy off" the prosecution or a prosecuting witness in a criminal case is not within the policy of the rule of exclusion.
 
 
 29
 While we have some doubts whether such a transaction would qualify as a settlement or compromise of a claim for purposes of Rule 408, that issue is irrelevant since there is no evidence that any witness was "bought off" in this case. As noted previously, Irving initiated the settlement and indicated a desire to abandon the lawsuit. Furthermore, he was bound by the settlement agreement, if not his conscience, to testify truthfully. Additionally, contrary to appellants' suggestion, he was not sequestered as a result of the settlement. He appeared and testified at his deposition and there is no indication that he would not have appeared at trial if the appellants had pursued their legal remedies against him.
 
 
 30
 Additionally, appellants suggest that the settlement agreement was relevant to Irving's credibility. However, if it had any effect at all, it could only have enhanced his credibility, because at the time of his deposition and trial he had no personal interest in the lawsuit.
 
 
 31
 Appellants' final argument is that the settlement agreement was similar to a Mary Carter agreement and should have been admitted to prevent the deception such agreements cause. See Ward v. Ochoa, 284 So.2d 385 (Fla.1973). A Mary Carter agreement has been defined as follows:
 
 
 32
 A Mary Carter agreement is an agreement entered into between a plaintiff and one or more but not all defendants which typically has the following features:
 
 
 33
 (A) secrecy;
 
 
 34
 (B) the agreeing defendants remain as party defendants in the lawsuit;
 
 
 35
 (C) the agreeing defendant's liability is decreased in direct proportion to the nonagreeing defendants' increase in liability;
 
 
 36
 (D) the agreeing defendant guarantees to the plaintiff a certain amount of money if plaintiff does not receive a judgment against any of the defendants or if the judgment is less than a specified sum.
 
 
 37
 Frier's, Inc. v. Seaboard Coastline Railroad Co., 355 So.2d 208 (Fla.App.1978); cert. dism. 360 So.2d 1250 (Fla.1978), citing, inter alia, Booth v. Mary Carter Paint Co., 202 So.2d 8 (Fla.App.1967).
 
 
 38
 The settlement agreement in this case does not satisfy any of the four requirements stated above. In fact, contrary to the provisions of a Mary Carter agreement, this settlement agreement resulted in a decrease of $750,000 in the liability of the non-settling defendant Myron Fass.[5] There is no element of deception present since the presiding judge in this case was obviously aware of the prior proceedings in the case at the time of the non-jury trial. Therefore, since this agreement bears no resemblance to a "Mary Carter" agreement, we need not consider its admissibility on that basis.
 
 
 39
 For the reasons stated above, the judgment of the district court is affirmed.
 
 APPENDIX
 RELEASE AGREEMENT
 
 40
 WHEREAS, there is presently pending in the United States District Court for the Eastern District of Wisconsin an action entitled Quad/Graphics, Inc. v. Myron Fass, Irving Fass, et al., C.A. No. 80-C-120 wherein the plaintiff has filed a Complaint seeking damages against the defendants in the sum of $1,529,611.55, together with interest, costs and disbursements; and
 
 
 41
 WHEREAS, Quad/Graphics, Inc. ("Quad/Graphics") and Irving Fass, one of the defendants, wish to settle and resolve all claims mutually asserted against one another therein or asserted by Irving Fass as a stockholder of the corporate defendants referred to therein;
 
 
 42
 NOW, THEREFORE, in consideration of the covenants and agreements expressed herein, it is hereby mutually agreed by and between the parties hereto as follows:
 
 
 43
 1. For and in consideration of the sum of TWENTY-FIVE THOUSAND DOLLARS, to Quad/Graphics in hand paid by Irving Fass, the receipt whereof is hereby acknowledged, Quad/Graphics does hereby, for itself, its successors and assigns, fully and forever release and discharge Irving Fass only from any and all demands, actions and causes of action, damages, claims for injuries, both known and unknown, costs, expense and compensation at any time to the date of this release by Quad/Graphics, reserving all claims against all other parties.
 
 
 44
 This is a release of Irving Fass only, who is also released and discharged to the extent of his liability, if any, for contribution or other judgment over and Quad/Graphics' claims and causes of action are credited and satisfied on his behalf to the extent of such percentage of the judgment Quad/Graphics may ultimately recover as the liability of Irving Fass may be determined to be of the liability of all of the defendants in the pending action against the parties. Quad/Graphics also covenants that it shall satisfy, on behalf of Irving Fass, and to such extent only, any judgment rendered in its favor in the above-mentioned action and further covenants that it shall not enforce said judgment against any other party to the extent that such enforcement would create a right of contribution against Irving Fass. The provisions of this paragraph shall not be construed to satisfy any claim of Quad/Graphics with respect to any property which Irving Fass may presently or hereafter hold on behalf of, or for the benefit of, Myron Fass, or to the extent of any assets hereafter transferred by Myron Fass to Irving Fass, without adequate consideration.
 
 
 45
 2. As further consideration, Irving Fass hereby transfers and assigns to Quad/Graphics any benefits which he may derive as a result of said action in any capacity, including his capacity as a shareholder (subject to shareholders' agreements) of certain defendants in said action which have filed counterclaims against Quad/Graphics. In that connection, Irving Fass represents and covenants that he is a 50% shareholder in each of the corporate defendants in said action except the defendant known as Readington Farms, Inc., and that in said capacity he is presently entitled to receive, and hereby assigns, 50% of his interest in said corporations (subject to shareholders' agreements) to the extent that the same may be created or established as a result of said counterclaims.
 
 
 46
 3. Irving Fass, for himself, his heirs, executors, administrators and assigns, fully and forever releases and discharges Quad/Graphics from any and all demands, actions and causes of actions, damages, claims for injuries, costs, expense and compensation for any reason at any time to the date of this Release, except any claims which may arise pursuant to this Agreement.
 
 
 47
 4. As further consideration, Irving Fass hereby agrees that he shall not hereafter voluntarily incur any liability whatsoever relating to the costs of defending the above-captioned action or to the prosecution of the counterclaims alleged therein. Furthermore, Irving Fass hereby covenants and agrees that he shall not voluntarily participate with any party involved in said litigation, provided that nothing contained herein shall impair the obligation of Irving Fass to give truthful and complete testimony as a witness at his deposition, or depositions, in said action.
 
 
 48
 5. This Release Agreement shall be effective among the parties hereto upon the execution hereof and upon the filing in Court of a stipulation dismissing Irving Fass as a party defendant in the above-entitled matter. The parties hereto further agree that they shall perform such acts as may be necessary at their own cost and expense to obtain an order approving said stipulation for dismissal, and that they shall execute any such documents necessary to enforce this Agreement.
 
 
 49
 EXECUTED at Milwaukee, Wisconsin, this 19th day of November, 1981.
 
 
 50
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 *
 In view of the letter of October 18, 1983 from counsel for the appellee, the opinion is being issued immediately upon the concurrence of the panel and will appear in slip opinion form at a later date
 
 
 **
 The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 The appellants claim error in the district court's refusal to require disclosure of the settlement agreement prior to ruling on the plaintiff's Motion to Dismiss. However, the district court was informed, in general terms, of the relevant provisions of the agreement and therefore no prejudice has been demonstrated
 
 
 [2]
 These considerations are relevant, however, to a determination by the court whether to award attorney's fees or costs to the defendant, see, e.g. Hamilton, supra 679 F.2d at 145. That type of relief is, of course, irrelevant to the situation in this case
 
 
 [3]
 The appellants did offer Irving's deposition in evidence and it was admitted
 
 
 [4]
 Federal Rule of Evidence 408 provides:
 Rule 408. Compromise and Offers to Compromise
 Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.
 
 
 [5]
 The parties included the following stipulation in the pretrial stipulation:
 
 
 [49]
 Quad/Graphics has entered into a Settlement Agreement whereby it has agreed to release Irving Fass from his personal liability and has agreed to release any claim against Myron Fass which would create a right of contribution against Irving Fass. As a result, any obligation of Myron Fass should be limited to the extent of One-half ( 1/2) of the total obligation of all defendants to Quad/Graphics